HORACE P. McCLARY v. GUY HUBBARD.

May Term, 1923.

Present: WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed October 15, 1923.

*Partnership—Transfer of A Partner's Interest in Trade Secret
Protection of Rights to A Trade Secret in Equity—Meas-
ure of Protection—Injunction—Necessity of Proving De-
vice A Secret—Adequacy of Measures Taken to Keep
Device Secret A Question of Fact—Meaning of Find-
ing That Evidence Was Not Conclusive—Finding Con-
strued—Presumption That Court Making Finding Consid-
ered All Evidence on That Question—Exception Because
of Insufficiency of Evidence—Finding of Inability to Find
Not Erroneous—Conclusiveness of Findings—Immaterial
Findings—Request to Find in Part Unsound—Burden of
Proof—Rights of Persons Acquiring Knowledge of a Secret
Device Fairly—Weight of Conflicting Evidence—Inade-
quate Briefing—Evidence Relating to Secrecy Maintained
Concerning Secret Device—Harmless Error—Motion to
Strike Out Evidence—Corroborating Testimony—Reason-
ableness of Price Asked for Secret Device as Evidence of
Good Faith.*

1. A sale by a retiring partner of all his interest in a partnership,
   including good will and all material, to his partner who con-
   tinues the business, effects a transfer to the latter of all the
   former's interest in whatever trade secret then existed as prop-
   erty and capable of transfer in connection with the business of
   the partnership.

2. One who invents or discovers, and keeps secret, a process of manu-
   facture, whether a proper subject for a patent or not, while
   not having an exclusive right to it as against the public or
   those who in good faith acquire knowledge of it, has a property
   therein which a court of chancery will protect against one
   who in violation of contract and breach of confidence under-
   takes to apply it to his own use, or to disclose it to third
   persons.

3. The measure of protection required by law, if a secret device is to be maintained as such, is a protection sufficient to prevent its discovery by fair means.

4. In a proceeding to enjoin the disclosure of an alleged trade secret, to make out a case entitling him to equitable protection, the plaintiff must establish that his alleged secret device is really a secret.

5. In such a proceeding the finding that adequate measures had not been taken to keep the device a secret was justified by the evidence.

6. In such a proceeding, the adequacy of measures taken to keep the device a secret is one of fact and not of law.

7. A finding, that the evidence was not conclusive that instructions to employees by members of a firm were for the purpose of protecting themselves with regard to their secret processes, did not imply that the plaintiff's evidence,. in the mind of the chancellor, must conclusively show that the instructions given were for such purpose, but merely meant that the plaintiff's evidence was refutable.

8. A finding that, "So far as appears except as above stated, no means were taken to prevent disclosure of information about the machines by the employees in the shop, or to prevent discovery by visitors in the shop, of the principles upon which the machines were constructed," etc., was not a finding that there was no evidence of means taken to prevent disclosure, but was a finding as to what means were in fact taken.

9. Where the contrary does not appear, the Supreme Court will presume that the chancellor, in making a finding of fact, considered all the evidence on the question.

10. An exception based on the insufficiency of the evidence to support the chancellor's finding will not be considered, where the evidence on the subject is not pointed out, nor in any way called to the Court's attention, as the transcript will not be searched by the Court for evidence to aid in a reversal of the decree.

11. In a proceeding to enjoin the disclosure of an alleged trade secret, a finding that a competent mechanical engineer, with even a hasty examination of the machine, should be able to produce a machine which would do the same work and upon the same principles without great difficulty was neither vague nor indefinite because it failed to state the. circumstances under

which such examination was or could be made, for as the cirstances varied the time required might vary, and yet the examination be hasty.

12. The statement of a chancellor that he is "unable to find" as to certain matters is not erroneous on the ground that there was evidence on which the finding should have been made, as such statement does not mean that there was no evidence tending so to show, but that, in his judgment, it does not preponderate, and that in a legal sense he was unable to make such a finding.

13. A finding of fact supported by competent evidence will not be disturbed, the weight of the evidence being for the trier.

14. The Supreme Court on appeal is bound by the chancellor's finding on a mixed question of law and fact, when such finding is supported by competent evidence.

15. Exceptions to findings that are immaterial will not be considered.

16. Where a request to find was in part unsound, it was not error to ignore the whole.

17. In a proceeding to enjoin the disclosure of an alleged secret device forming part of certain machines, some of which were stored in a barn, plaintiff had the burden of showing what, if anything, was done to prevent their examination, and, nothing being shown either way, the finding that the machines were so stored "without any particular pains being taken to prevent their examination," was as favorable to plaintiff as he was entitled to have it.

18. When information or knowledge of a secret device is acquired by fair means by persons in no wise connected with the business of the firm, even though they neither use nor communicate it, they are free to use it, and to communicate it to whomsoever they will.

19. Where evidence is conflicting, its weight is for the chancellor, and his finding, or failure to find as requested, on the question, will not be disturbed.

20. Where the brief contained simply a repetition of what was said in taking the exception to the admission of certain evidence, the briefing on the point was inadequate.

21. In a proceeding to enjoin the disclosure of an alleged secret device forming part of a machine, evidence that children had played with such a machine stored in a barn was admissible on the question of the secrecy maintained by the owners of the alleged trade secret.

22. In such a proceeding, where the issue was whether the alleged
    trade secret had been kept a secret, the admission of evidence
    tending to show that such device was made up of a combina-
    tion of common mechanical principles for years well known
    and understood by mechanical engineers and machinists, if
    error, was harmless.

23. Refusal to grant a motion to strike out part of an answer as
    hearsay was not error where, with ample opportunity to have
    made the motion sooner, the motion was not made until an-
    other question had been asked and answered, and still another
    question asked.

24. In an action to enjoin the disclosure of an alleged secret device,
    where defendant, in meeting certain testimony by plaintiff's
    sons, testified that he had informed them that his father, the
    inventor of the device, had told him that the inspiration there-
    for was gained from a certain rifle, it was not error to admit
    evidence, in connection with the witness's testimony, explain-
    ing the similarity in principle of such device and such rifle, as
    it tended to strengthen his testimony.

25. In such an action defendant's testimony as to the reasonableness
    of the price asked by him from plaintiff for drawings which
    he made of a machine containing the alleged secret device was
    admissible over the objection that it was immaterial, as it had
    some bearing on the question of his good faith.

APPEAL IN CHANCERY. Heard on bill, answer, and findings
of fact by the chancellor at the December Term, 1922, Windsor
County, *Wilson*, Chancellor. Bill dismissed. Plaintiff appealed.
The opinion states the case. *Affirmed and remanded with direc-
tions.*

*Marvelle C. Webber* and *Fred G. Bicknell* for the plaintiff.

Independent of copyright or letters patent, an inventor has,
by common law, an exclusive property in his invention or com-
position until, by publication, it becomes the property of the
general public, and the power to protect such property is part
of the original jurisdiction of chancery. Nims on Unfair Com-
petition and Trade-Marks, 2nd ed., p. 295; *Tabor* v. *Hoffman*, 41
Hun. 5, 118 N. Y. 30; *Pollard* v. *Photographic Co.*, 40 Ch. Div.
345.

Equity will restrain disclosure of a trade secret, where knowledge thereof was obtained in violation of trust or confidence, surreptitiously, or fraudulently. *Morrison* v. *Moat,* 21 L. J. N. S. 248, 9 Hare 241, 68 Eng. Rep. 492; *Simmons Hardware Co.* v. *Waibel,* 1 S. D. 492, 11 L. R. A. 267, 36 A. S. R. 755; 12 L. R. A. (N. S.) 102, note entitled "Trade Secrets," 104; *Eastern Extracting Co.* v. *Greater New York Extracting Co.,* 110 N. Y. S. 783; *Elaterite Paint & Mfg. Co.* v. *Frost Co.,* 105 Minn. 239, 117 N. W. 388; *Vulcan Detinning Co.* v. *American Can. Co.,* 69 Atl. 1103, 73 Atl. 603, 75 N. J. Eq. 542; *Tipping* v. *Clarke,* 2 Hare 389, 67 Eng. Rep. 157; *Chamber of Commerce* v. *Wells,* 100 Minn. 205. See also Nims on Unfair Competition and Trade-Marks, 2nd ed., pp. 315-316; *C. F. Simmons Medicine Co.* v. *Simmons,* 81 Fed. 163.

An injunction will lie against the use of a trade secret so obtained, without any proof that any disclosure has been made. Nims on Unfair Competition and Trade-Marks, 2nd ed., p. 305; *Tolman* v. *Mulcahy,* 119 App. Div. (N. Y.) 42, 103 N. Y. S. 936; *Merryweather* v. *Moore,* 2 Ch. 518.

It is not a revelation of a secret device to show the machine of which the device forms a part to one employed to assist in its completion, or to employees. Nims on Unfair Competition and Trade-Marks, 2nd ed., pp. 306, 309; *Empire Steam Laundry* v. *Lozier,* 165 Cal. 95; *Lamb* v. *Evans,* 3 Ch. 462; *Little* v. *Gallus,* 4 App. Div. 569, 38 N. Y. S. 487; *O. & W. Thum Co.* v. *Tloczynski,* 114 Mich. 149, 38 L. R. A. 200.

*Gilbert F. Davis, John G. Sargent,* and *Walter S. Fenton* for defendant.

In an action to enjoin the disclosure of an alleged secret device, the plaintiff has the burden of establishing every essential element to make out a case, *Amber Size & Chemical Co., Ltd.* v. *Menzel, Law Reports,* 2 Ch. Div. 239; *Macbeth-Evans Glass Co.* v. *Schnelbach,* 239 Pa. 76, 86 Atl. 688; *Hamilton Manufacturing Co.* v. *Tubbs Manufacturing Co. et al.,* 216 Fed. 401, 407; *Westervelt* v. *National Paper, etc., Co.,* 154 Ind. 673, 678, 57 N. E. 552.

The protection granted in such cases is not against the public, or against those who in good faith acquire knowledge of the secret, but against one who, in violation of contract and

breach of confidence, undertakes to apply it to his own use, or to disclose it to third parties. *Peabody* v. *Norfolk*, 98 Mass. 452, 96 A. D. 664; *Taber* v. *Hoffman*, 118 N. Y. 30, 23 N. E. 12; *Pomeroy Ink Co.* v. *Pomeroy*, 77 N. J. Eq. 293, 77 Atl. 698; *Macbeth-Evans Glass Co.* v. *Schnelbach*, 239 Pa. 76, 86 Atl. 688; *O. & W. Thum Co.* v. *Tloczynski*, 114 Mich. 149, 38 L. R. A. 200, 204.

The plaintiff must use adequate precaution to protect and guard his secret from becoming known. *Hamilton Manufacturing Co.* v. *Tubbs Manufacturing Co. et al.*, 216 Fed. 401; *American Stay Co.* v. *Delaney*, 211 Mass. 229, 97 N. E. 911; *Bristol* v. *Equitable Life Assurance Society*, 132 N. Y. 264, 30 N. E. 506.

Notice of a claimed trade secret is absolutely essential. *Amber Size & Chemical Co., Ltd.* v. *Menzel, Law Reports*, 2 Ch. Div. 239; *Hamilton Manufacturing Co.* v. *Tubbs Manufacturing Co., supra; Cincinnati Bell Foundry Co.* v. *Dodds* (Ohio Sup. Ct.), 19 Weekly Law Bulletin, 84; *Westervelt* v. *National Paper Co.*, 154 Ind. 673, 57 N. E. 552.

WATSON, C. J.　The plaintiff seeks to have the defendant enjoined from disclosing, divulging, or disposing of a certain alleged trade secret contained in a certain machine used in the manufacture of diamond-shaped glazier's points, or in certain mechanism or parts of said machine, concealed and placed out of sight, and which could not be discovered without disassembling the machine; and from exhibiting, divulging, disclosing, or disposing of any sketches, drawings, patterns, or data, which give information relating to said alleged secret parts. The facts were found by a chancellor, and decree rendered dismissing the bill with costs to defendant. The case is here on plaintiff's appeal.

It appears from the findings that the defendant, who is a mechanical engineer with a thorough mechanical training, both technical and practical, is a son of George W. Hubbard who died February 3, 1918. The plaintiff, Horace P. McClary, died after bringing this suit, and on August 30, 1921. Horace P. Mc-Clary, Jr., executor of his father's will, has entered to prosecute.

In January, 1877, George W. Hubbard and the plaintiff entered into a partnership under the firm name of Hubbard & Mc-Clary, for the manufacture and sale of certain articles. The business of the firm was conducted at Windsor.

George W. Hubbard was a machinist and inventor. Horace P. McClary had no particular part in the running of the shop conducted by the partnership. His part of the business was to look after the financial end, such as sales, advertising, and collections, while his partner ran the shop. He did practically no work in the shops, and during all the latter part of the time covered by the partnership he was principally engaged in the banking business.

The partnership entered upon the manufacture of diamond-shaped glazier's points at some time subsequent to 1878. About that time Hubbard invented a machine for the manufacture of diamond-shaped glazier's points, which machine, by reason of its mechanical principles and the efficiency with which it did its work, was useful and valuable. No application was ever made for a patent on this machine. The machines were made in two sizes, or were made to produce two sizes of glazier's points, the so-called No. 1 machine producing the smaller point. Seven No. 1 machines have been built from that time to the present, of which five are now in the shop and two are practically dismantled and stored at present at the late residence of the plaintiff. One No. 2 machine has been completed and is in the shop, and another not complete is stored at the McClary residence. There is a limited demand for glazier's points and one of these machines produces a great number of points in a day. At the time of trial, with four machines in operation, approximately 360 packages, each containing 5,000 points, were produced in a day. At the present time there is but one other concern in the United States producing diamond-shaped glazier's points, that concern being W. H. Maze & Co., of Peru, Illinois.

The glazier point business as developed by Hubbard & McClary became profitable. At times the concern had five or six machines in operation. No patent was applied for on the machine because it was not intended or desired to have the machine on the market for sale as a few machines would make all the diamond-shaped glazier's points the whole country would use. The plaintiff claims that these machines were kept and maintained by the firm as a trade secret.

[1] On February 10, 1916, the partnership was dissolved by Hubbard's selling to McClary, for the consideration of $13,118.85, all his interest in the Hubbard & McClary business,

including all good-will and material of all kinds some of which was located in Hubbard's barn, etc. Some findings are made respecting Hubbard's mental condition at the time of making this sale; but concerning this particular matter the present case has nothing to do. The transaction stands here as effecting a transfer to McClary of Hubbard's interest in whatever trade secret then existed as property and capable of transfer in connection with the business of the partnership. *Pomeroy Ink Co.* v. *Pomeroy*, 77 N. J. Eq., 293, 78 Atl. 698.

[2]  In *Peabody* v. *Norfolk*, 98 Mass. 452, 96 A. D. 664, sometimes referred to as the leading case on the subject in this country, it is said: "If he (a man) invents or discovers, and keeps secret, a process of manufacture, whether a proper subject for a patent or not, he has not, indeed, an exclusive right to it as against the public, or against those who in good faith acquire knowledge of it; but he has a property in it, which a court of chancery will protect against one who in violation of contract and breach of confidence undertakes to apply it to his own use, or to disclose it to third persons." To the same effect is *Westervelt* v. *National Paper & Sup. Co.*, 154 Ind. 673, 57 N. E. 552. And if a trade secret be claimed, it devolves upon the originator or owner himself to protect it from disclosure or publication. *Bristol* v. *Equitable Life Assur. Society*, 132 N. Y. 264, 30 N. E. 506, 28 A. S. R. 568; *Hamilton Mfg. Co.* v. *Tubbs Mfg. Co.*, 216 Fed. 401.

The record shows three series of exceptions. One to findings made, designated by the letter "A" joined by the serial number, as "(A1)," "(A2)," etc. One to failure to comply with requests to find, designated by the letter "B" joined by the serial number in the same manner. And one to rulings on questions of evidence, designated by the letter "C" joined by the serial number in like manner.

The defendant, both in his answer and by his evidence, denies that the trade secret claimed by plaintiff ever existed, and further denies that it was kept secret by the partnership, and by the plaintiff after he became sole owner of the business. These were the two primary questions of fact contested before the chancellor. They are also the most important questions in review.

It is found that George W. Hubbard and Horace P. McClary, Sr., considered the point machine to be a trade secret. While there is some doubt whether this finding shows the existence originally of such a secret, we treat it as of such force, and pass to the consideration of the question whether the secret was in fact kept as such by them and later by the plaintiff, within the meaning of the law governing that subject. On this question it is found that at the time Mr. Hubbard was perfecting this machine he showed it to various skilled mechanics, machinists and inventors, including a member of the firm of Jones & Lamson of Springfield, one of the leading concerns of the section engaged in the machine business; that after the machine was completed so it did proper work, both Hubbard and McClary invited in prominent citizens of Windsor and vicinity, and exhibited it to them; that after the machines were put in operation the shop where they were operated was occasionally visited by persons not connected with the business; that a "No Admittance" sign was at one time placed over the door leading into the shop, but it appears that persons came into the shop, not only on business, but to talk with the help about their own affairs and to loaf with the help at the noon hour; that for a time the door at the entrance to the shop was kept locked during working hours and a bell was used for gaining admittance; that the foreman of the shop, who had been employed by the firm for thirty-one years, never had any instructions from his employers, so far as appears, with reference to keeping people away from the machines; the foreman testifying that Mr. Hubbard stated at one time that all the protection he had on the machines, "was to keep it dark," but never gave him instructions as to what he should do with reference to that; that a brother of the foreman, who has worked for the firm since 1892 and who operated the machines much of the time, testified that at one time his employers gave him instructions to keep the public out of the shop, and that he endeavored to carry out those instructions, occasionally making people leave the work-rooms, and endeavoring to keep people away from the machines; that so far as appears from the evidence, however, the precautions taken were such as might be expected in any machine shop where the presence of strangers might tend to reduce the efficiency of the help and where the danger from accident about the machines is ever present; that

while it may be that the instructions given by the members of
the firm were for the purpose of protecting themselves with re-
gard to their secret processes, yet the evidence is not conclusive
that the instructions were given for that purpose; that the part-
ners considered these machines to be of value in their business
and that their value depended to a large extent upon keeping
within their control the information upon which other machines
similar to these could be made; that they probably intended not
to have knowledge of the construction of these machines go to
people who would make use of that knowledge to the injury of
the business of the partnership; but in fact they took inadequate
measures to protect themselves in the control of the secret of the
machine; that so far as appears, except as above stated, no means
were taken to prevent disclosure of information about the ma-
chines by the employees in the shop or to prevent discovery by
visitors in the shop of the principles upon which the machines
were constructed, whether those visitors were persons of mechan-
ical skill or otherwise; that since the dissolution of the partner-
ship, on one or more occasions, an expert mechanical engineer
and inventor has been shown the machine by Mr. McClary and
given opportunity to examine it in so far as he could without
removing any of its parts; that some of the essential working
parts of the machine are hidden from view; that for a number
of years a point-cutting machine, partially dismantled, stood in
the barn at the George W. Hubbard residence, where the same
was open to examination and observation by anybody who hap-
pened to be about, and that machine remained there in the barn
until it was taken therefrom in July, 1916, by virtue of a replevin
writ sued out by McClary; that the firm did not use reasonable
precaution to prevent this trade secret becoming known to other
people so that it might be used in competition with the business
of the firm; that the plaintiff after he gained full control of the
business failed to guard the point machine as a trade secret with
reasonable care; that in fact during the whole course of time
after the point machine was first used by Hubbard & McClary
they apparently relied more upon the improbability that any-
body would care to copy the point machine and enter into com-
petition with them in the business of making diamond-shaped
glazier's points than upon a close guarding of the point machine
as a trade secret; that the machines are so constructed that an

ordinary person without mechanical training or learning would be very unlikely to discover the principles upon which they operate, unless given opportunity to take the machine apart; but as a matter of fact the machines are very simple when understood, the feeding device uses gravity, the cutting device is a simple adaptation of the ordinary metal shears, and the stacking device is an adaptation of principles known for many years to mechanical engineers and machinists, adaptations of the stacking device being in common use in a great many different machines; that a competent mechanical engineer, with even a hasty examination of this machine, should be able to produce a machine which would do the same work and upon the same principles without great difficulty; and that the presence of the machine at the Hubbard barn was known to the plaintiff all the time and no effort was made by him to take it away until by replevin as mentioned above.

[3, 4]   The simpler and commoner the principles entering into the combination constituting a secret device are, the more likely is the device to be discovered and copied or reproduced. And the measure of protection required by law, if a secret device is to be maintained as such, is a protection sufficient to prevent its discovery by fair means.   Thus it is said in a leading article on Unfair Competition, 10 Harv. Law Rev. 295, "The communication or use of a trade secret by one who is bound in good conscience not to use or communicate it will be restrained, and the equity will follow the secret into the hands of all who take with notice; but when fairly discovered or taken without notice it is free."   And Professor Langdell said (in a leading article, 12 Harv. Law Rev. 553), "The only means that an inventor has, on any principle yet indicated, of preventing the use and enjoyment of his invention by others is that of keeping it secret."   To the same effect is *Estcourt* v. *Estcourt Hop. Ess. Co. L. R.,* 10 Ch. 276.   The same rule of requirement as to the measure of protection is to be drawn from what is said in *Peabody* v. *Norfolk, supra,* in *Chadwick* v. *Covell,* 151 Mass. 190, 23 N. E. 1068, 6 L. R. A. 839, 21 A. S. R. 442, in *American Stay Co.* v. *Delaney,* 211 Mass. 229, 97 N. E. 911, Ann. Cas. 1913B, 509, in *Westervelt* v. *National Paper & Sup. Co., supra,* in *Tabor* v. *Hoffman,* 118 N. Y. 30, 23 N. E. 12, 16 A. S. R. 710, and in *Elaterite Paint & Mfg. Co.* v. *S. E. Frost Co.,* 105 Minn. 239, 117 N. W. 388. In

*Cincinnati Bell Foundry Co.* v. *Dodds*, 19 Wkly. Law Bul. 84, Judge Taft (now Chief Justice of the United States) said: ''The property in a secret process is the power to make use of it to the exclusion of the world. If the world knows the process, then the property disappears. There can be no property in a process, and no right of protection, if knowledge of it is common to the world.'' To make out a case entitling him to equitable protection, the plaintiff must establish that his alleged secret device is really a secret. *Macbeth-Evans Glass Co.* v. *Schnelbach*, 239 Pa. 76, 86 Atl. 688; *Hamilton Mfg. Co.* v. *Tubbs Mfg. Co.*, 216 Fed. 401; *Amber Size & Chem. Co.* v. *Menzel*, 2 Ch. Div. (1913) 239.

The chancellor further states in the findings that the replevin writ mentioned above called for the machine in the Hubbard barn and a set of drawings for point machines and staple machines, and that some drawings of machines were taken as appears by the officer's return; that it does not appear, however, that any drawings of the point machines came to the attention of the defendant other than those which he made himself; that he is unable to find from the evidence that the defendant obtained any knowledge as to these machines from his father at any time of such a nature that it would have been of any value in the production of new machines or duplication of the machines at the shop; that he is unable to find that the defendant at any time received from his father or from the plaintiff any information about the machines of such a nature that he could be held to be bound to secrecy as to such information, or bound not to use the information; that he is unable to find that the defendant used any improper methods to obtain knowledge as to these machines; that the only valuable knowledge which he obtained as to them was obtained after the partnership was dissolved by virtue of the sale in February, 1916, and at a time when the plaintiff should have been guarding his machines if he desired to keep them secret; that at the time defendant studied the machine in the Hubbard barn (in May, 1916) of which he then made drawings, so far as the chancellor was able to find from the evidence, he sustained to the plaintiff no different relations than any other person would have sustained; that defendant was the son of George W. Hubbard who invented the machine, but that, so far as the chancellor was able to find, he was under no obligations not to use his skill and mechanical

knowledge to acquire information about these machines when the means of information was so readily accessible; that he is unable to find that the defendant obtained any knowledge of the machine previous to the dissolution of the partnership of such a nature that the knowledge would have been of any particular use in any attempt to use the principles of the machine or to copy or duplicate it; that defendant had no part in the sale by his father of the half interest in the firm business to the plaintiff, and in fact did not know about the sale until some time after it had been consummated; that defendant obtained his knowledge of the point machine by examination of the machine that had for years been kept in the Hubbard barn in a place where it was subject to examination by many people and, being in a partially dismantled condition, its secret parts were easily examined and their secrets discovered; that he is unable to find that the defendant understood the point machine to be a trade secret although he may have had such understanding; that defendant did call to the attention of the plaintiff's son that there was a secret with reference to the point-driving machine, the secret being as to the source from which George W. Hubbard obtained the idea which he put to use in that machine and upon which he obtained a patent.

Since it appears that whatever valuable knowledge defendant has of the machine was obtained by him fairly and honestly a long time, to wit, more than three months after the partnership was dissolved, and since there is an absolute failure to find that, at the time he obtained such knowledge and made drawings of the machine, he sustained to the plaintiff any relations other than those common to persons in general, the plaintiff's right to prevent the use or communication of the claimed secret process by the defendant does not depend upon a breach of contract, trust, or confidence, but solely upon his possessing a common law right of property in the process. Consequently the instant case is not one involving the right of the plaintiff against the defendant simply, but one involving his right against the world. *Morrison* v. *Moat,* 9 Hare 241, 258; *Prince Albert* v. *Strange,* 1 Macn. & G. 25.

[5, 6] While as already seen George W. Hubbard and Horace McClary, Sr., considered the machine to be a trade secret, yet there is no finding that they kept it secret. On the contrary

the finding "that in fact they took inadequate measures to pro-
tect themselves in the control of the secrets of the machine," is
tantamount to a finding that it was not kept secret, for had it
been so kept the measures taken would have been in keeping with
the requirements of law in that respect, and not "inadequate."
However, this finding is challenged by exception (A2), on the
grounds that (1) it is contrary to the evidence and not war-
ranted; (2) the adequacy of the measures taken is a question of
law to be determined on the facts found as to what measures
were taken; and (3) on the evidence the measures taken were
adequate. In disposing of the first and third grounds, it is
unnecessary to detail the evidence bearing on the question. A
careful examination of it shows a conflict therein, with so much,
including the inference which may fairly be drawn from the other
facts found, supporting the finding in question, that the latter
cannot be said to be contrary to the evidence or unwarranted by
it. Nor do we think the second ground (that the adequacy of
the measures taken was a question of law) is sound. But if
we were to treat the question as one of law to be determined on
the facts found as to the measures taken, the result would be the
same; for clearly on those facts the process of manufacture was
disclosed at different times by the acts of the owners or owner
of the business, to persons not connected therewith, in exhibiting
the machines to them, and in storing one of the machines for a
large number of years in the Hubbard barn, where it could be
and was seen by more or less of such persons, and where, the
findings show, the defendant, in May, 1916 (more than three
months after plaintiff became the sole owner of the business),
in the exercise of fair means examined and made drawings of it.
Our holdings in disposing of this exception are controlling as to
exceptions (A13) and (A17), where the same legal questions are
raised as to similar findings, except they negative the use of
"reasonable precaution" and the use of "reasonable care."
Although the two phrases quoted are inappropriate to the sub-
ject-matter, and their meaning not altogether clear, it is certain
that the findings of which they form a part show a lack of such
precaution or care as was sufficient to prevent the alleged secret
process from becoming known to other people. And this hold-
ing as to (A17) is decisive as to exception (B25) to the denial
of a request to find.

[7]   (A1).   The findings state: "So far as appears, however, the precautions that were taken were such as might be expected in any machine shop where the presence of strangers might tend to reduce the efficiency of the help and where the danger from accident about machines is ever present.   While it may be that the instructions given by the members of the firm were for the purpose of protecting themselves with regard to their secret processes, yet the evidence is not conclusive that the instructions were given for that purpose."   Exception was taken to his part of the findings on the grounds that (1) the evidence showing the precautions that were taken was for the purpose of protecting the trade secret, and there was no evidence on which it could be found that the precautions were taken for the purpose of protecting from accident about the machines or for making the help more efficient; (2) the findings referred to are based upon mere conjecture and not upon evidence; (3) the evidence as to the purpose of the precaution does not need to be conclusive but only needs to preponderate.   But the grounds so assigned do not seem very substantial.   (1) and (2).   The findings state the precautions which were in fact taken, and, with the burden resting on the plaintiff to establish all the essential elements of his case, it was not far afield for the chancellor to liken the precautions taken to those which, in common knowledge, might be expected in machine shops for greater efficiency of employees, or to safeguard against dangers from running machinery.   Ground (3) seems to imply that, in order to avail the plaintiff, his evidence, in the mind of the chancellor, must conclusively show that the instructions given by the partners were for the purpose of protecting themselves with respect of their secret processes.   But what the chancellor said in that respect means only that the plaintiff's evidence was refutable.

[8, 9]   (A3).   It is stated in the findings:   "So far as appears except as above stated, no means were taken to prevent disclosure of information about the machines by the employees in the shop, or to prevent discovery by visitors in the shop, of the principles upon which the machines were constructed, whether those visitors were persons possessed of mechanical skill or otherwise."   The grounds of this exception are that (1) "there was evidence, as the transcript will show, other than the evidence stated in the findings prior to the findings here excepted to, as to

means taken to prevent disclosure of such information, such evidence being by other employees and witnesses improved by the plaintiff, and by the very construction of the machine which was so made as to prevent a disclosure of its operation except by taking the same apart;'' (2) ''it was not necessary to take precautions to prevent employees in the shop from getting knowledge of the machine, because by their employment they were under obligation of law not to reveal the same''; (3) ''as far as the visitors were concerned, there is nothing in the evidence to show that the defendant ever acquired any information from them, or that any other person ever did.''

An insurmountable difficulty with ground (1) is, that it seems to construe the finding as though it said that except as before stated there was no evidence of means taken to prevent disclosure, etc., whereas the finding is as to what means were in fact taken, and presumably all the evidence bearing on the question was considered, the contrary not appearing. Nor is ground (2) more to the point. The finding speaks of means taken to prevent disclosure ''by the employees,'' not to prevent them from getting knowledge themselves. Ground (3) loses sight of the fact that a disclosure to, or discovery by, visitors in the shop, is inconsistent with that secrecy essential to the safe keeping of a trade secret.

[10, 11]   (A5).   This exception is to the finding: ''It appeared in testimony, and I find that a competent mechanical engineer, with even a hasty examination of this machine, should be able to produce a machine which would do the same work and upon the same principles without great difficulty.'' The grounds of the objection are that: (1) The finding is contrary to the evidence and not warranted by it; (2) it is vague and indefinite as to the circumstances under which such examination was or could be made; (3) it is not a question whether a competent mechanical engineer should be able to reproduce such a machine by hasty examination, but rather a question as to whether, as a matter of fact, reasonable precautions were taken to prevent the discovery of the trade secret, and whether as a matter of fact such precautions were sufficient. As to ground (1), the evidence on the subject is not pointed out nor in any way called to our attention, and the transcript will not be searched for it to aid in a reversal of the decree. Ground (2) is without avail.

What constitutes a hasty examination depends to a considerable extent upon the circumstances in which it is made. The circumstances varying, the time required might vary, and yet the examination be a hasty one. This shows that, within reason, the finding is, neither vague nor indefinite. As to ground (3), the finding makes clear a cogent circumstance of evidence bearing on the question whether the protective measures taken were adequate.

(A18). The chancellor says in the findings: "In fact during the whole course of time after the point machine was first used by Hubbard and McClary I find they apparently relied more upon the improbability that anybody would care to copy the point machine and enter into competition with them in the business of making diamond-shaped glazier's points than upon a close guarding of the point machine as a trade secret." The ground of the exception is, that the finding is contrary to the evidence, has no basis in the testimony, and is mere conjecture. This exception cannot be sustained. The circumstances shown, and the inferences fairly to be drawn from the other facts found, were such that we cannot say this finding was not warranted.

[12] Exception was taken in numerous instances to the statement of the chancellor that he is "unable to find" as there stated. The ground of the objection, save in one instance, is that there was evidence on which the finding so refused should have been made. Such a statement by the chancellor does not necessarily mean that there was no evidence tending so to show, but it does mean that such evidence, in his judgment, does not preponderate, and so in a legal sense he was "unable" to make such a finding. Instances of this character are seen in connection with the findings as shown by exceptions Nos. (A8), (A9), (A10), (A14), (A19), and (A21).

[13] (A7). To the statement in the finding that "It does not appear, however, that any drawings of the point machines came to the attention of the defendant other than those which he made himself," exception was taken on the ground that there was evidence showing that prior to the date in May, 1916, when he made such drawings himself, he did have drawings either made by himself or by his father, and so the finding is contrary to the evidence. But the finding is supported by evidence given by defendant and will not be disturbed. The

weight of the evidence on the question was for the trier. Under exception (A10), plaintiff says that whether the defendant used improper methods to obtain knowledge as to these machines (found in the negative by the chancellor) was not a question of fact, but one of law. Assuming but not deciding this to be so, the result is not different from the fact found, for the findings form no proper basis for a conclusion of law otherwise.

(A11). The finding that the only valuable knowledge which the defendant obtained as to the machines was obtained after the partnership was dissolved, and at a time when the plaintiff should have been guarding his machines if he desired to keep them secret, is excepted to as contrary to the evidence. But this finding is supported by competent evidence, and therefore it will not be disturbed. *Smith & Nye* v. *Munsell,* 94 Vt. 201, 110 Atl. 12. This holding is decisive against exceptions (B13), (B21), and (B23), requests as to findings.

[14] (A12). The finding is: "At the time the defendant studied the machine from which he made drawings, so far as I am able to find from the evidence, he sustained to the plaintiff no different relations than any other person would have sustained. He was the son of George W. Hubbard who invented the machine, but so far as I am able to find he was under no obligations not to use his skill and mechanical knowledge to acquire information about these machines when the means of information was so readily accessible." The grounds of the exception are that (1) the finding is contrary to the evidence; and (2) the question of his obligation not to use his skill and knowledge to acquire information about these machines, is one of law to be determined on all the evidence in the case, and if so determined the conclusion is unwarranted. As to the first ground the exception is not sustained for the same reason stated in disposing of exception (A11). As to the second ground, it is said in plaintiff's brief that the finding is at least partly a question of law, meaning, we suppose, that it is a mixed question of law and fact. Granting but not deciding this to be so, we are bound by the finding. *Auer & Twitchell* v. *Robertson Paper Co.,* 94 Vt. 473, 111 Atl. 570.

(A20). In April, 1921, defendant had some negotiations with the plaintiff through the latter's sons, looking to an arrangement between the plaintiff and the defendant by which either

certain inventions made by defendant should be utilized in connection with plaintiff's point machine, or else a new machine, invented by defendant, should be utilized in substitution for the old point machine. It is found that during these negotiations no claim was made by the plaintiff that defendant was under any obligation not to use or disclose his information with reference to the point machine, or, in other words, no claim was made to defendant until about the time of bringing this suit that the point machine was a trade secret. To this finding an exception was saved on the ground that it is contrary to the evidence. But the exception is without force. The evidence in this regard was conflicting, the finding being supported by the positive testimony of the defendant.

[15] As we view the case, the findings to which exceptions Nos. (A6), (A15), (A16), (A22), and (A23), were taken, are immaterial and not further noticed; also exception (B20) to denial of request; also exception (C1), taken to the admission of evidence showing the mental condition of George W. Hubbard at the time the contract dissolving the partnership was entered into, is not further noticed for the same reason.

Exceptions to the noncompliance with certain requests for findings are now considered.

(B2 and B3). These requests are for findings as to the names of a certain foreman in the shop, and an employee, who gave testimony. The chancellor saw them and heard them state their positions. It is not apparent that a compliance with these requests was of any consequence.

[16] (B4). This request is in part that there "was no evidence that the employees or visitors got any information from which they could reconstruct the machines." This part of the request is not according to the fact, for there was such evidence as to some of the visitors. The request being in part unsound, it was not error to ignore the whole.

(B5). This request was, "So far as any other persons are concerned, excepting defendant, the evidence does not show that the measures taken by the partnership and the plaintiff to protect themselves in their trade secret, were not in fact adequate." The trouble with this request is, that its statement as to the evidence is not borne out by the transcript.

(B8) This request in part states that the machine in Hubbard's barn "was a number 2 machine and never been completed." As to whether it had ever been completed, the evidence was conflicting. The machine itself, which the chancellor saw, was physical evidence that it had been used in making points, and consequently it must have been completed. The testimony of the defendant was to the same effect. For the same reason stated in disposing of request (B4), it was not error to ignore the whole request.

[17] (B9). By this request the chancellor was asked to find that the machines stored in the McClary barn were in the back part of the hay loft, and there is no evidence of their ever being seen there or examined by any one. It is found that at different times machines have been stored at that barn, "without any particular pains being taken to prevent their examination." Plaintiff's brief states that there was no evidence one way or the other as to any thing being done to prevent people examining the machines at that barn. The burden was on the plaintiff to show what, if anything, was done to prevent such examination. Nothing being shown either way, the finding made was as favorable to the plaintiff as he was entitled to have it.

(B14). The chancellor was requested to find that defendant sent the information to the plaintiff that he was in possession of plans and drawings of the point machine from which he could quickly construct an exact duplicate of plaintiff's machine, and that he should sell the information for a large sum of money by which such a duplicate could be made, unless the latter purchased of defendant the plans and sketches of the machine. We are referred to letters between the defendant and H. P. McClary, Jr., as evidence supporting such requests. No other evidence is relied upon for this purpose. The letters do not come up to the request, and its refusal was not error. What we have here said is controlling as to request (B26).

(B18). The findings made are a substantial compliance with this request; also with requests (B33) and (B34).

[18] (B22). This request was to find that there was no evidence that any person or persons, other than the defendant, had obtained any information or knowledge of the construction of the machine, or that it has in fact been used by them or divulged to the defendant or any one else in competition with

the business of the firm. This was well refused. The fore part, that there "was no evidence," etc., as there stated, is contrary to what is shown by the transcript. Whether the person or persons who had obtained information or knowledge, have in fact used it or divulged it to any one in competition with the business of the firm, is not of much consequence; for when such information or knowledge is acquired by fair means by persons in no wise connected with the business of the firm, even though they neither use nor communicate it, they are free to use it, and to communicate it to whomsoever they will.

[19]    (B27). This is a request to find that defendant knew the point machine to be a trade secret. The evidence on this question was conflicting. Defendant testified that he did not have such knowledge. The weight of testimony given was for the chancellor, and his finding, or failure to find as requested, on the question, will not be disturbed. Requests (B28), (B29), (B30), and (B31), are disposed of in the same way for the same reason.

(B35). A finding is requested that as early as February, 1916, the defendant claimed he could build plaintiff's point machine. Here again the evidence was conflicting, defendant's testimony being that he then said he thought he could build a point machine, but made no positive statement that he could. However, even if it be a fact that such a claim was made by him at the time named, such fact, in itself, was not material to the case beyond its use as evidence, and presumably in that respect it was given proper consideration, the contrary not appearing.

Exceptions to rulings on questions of evidence.

[20]    (C2). Subject to exception one Sevigne was permitted to testify about the time when, as a small boy, he had seen George Tarby, an employee of the firm, show his friends, when they came into the shop, how the point machine was operated. Plaintiff's brief states the ground of the exception to have been that what Tarby did would not bind Hubbard and McClary. Assuming, though it is doubtful, that this is substantially the same ground as that shown by the transcript which is made controlling, the point is not adequately briefed, the brief containing simply a repetition of what was said in taking the exception. *McAllister* v. *Benjamin,* 96 Vt. 475, 121 Atl. 263.

[21]  (C3).  Subject to exception on the ground of not being relevant or material for the purpose of showing publication, several witnesses gave testimony that, when small boys and playing with other boys in the Hubbard barn, they played with the point machine there stored, turning the large fly wheel, thereby causing the table, or some sort of a steel appartus on the machine, to move up and down, etc.  Such evidence was offered as bearing on the question of the secrecy maintained by Hubbard & McClary of the alleged trade secret, and for that purpose it was properly received.

[22]  (C4).  Several exceptions were saved to the admission of certified copies of record in the granting of several letters patent, on the ground that they were incompetent, irrelevant, and immaterial.  These letters patent, in connection with the testimony of the witness or witnesses, tended to show that the combination constituting the secret device claimed by plaintiff is made up of comon mechanical principles, for years well known and understood by mechanical engineers and machinists.  Also a practical mechanical engineer, and a draftsman and machine designer, used as witnesses, were permitted, against exception, to describe or explain the drawings and specifications connected with such letters patent.  The findings state: "As a matter of fact the machines (in question) are very simple when understood, as will be seen from the description hereinbefore given.  The feeding device uses gravity; the cutting device is a simple adaptation of the ordinary metal shear, and the stacking device is an adaptation of principles known for many years to mechanical engineers and machinists.  Adaptations of the stacking device are in common use in a great many different machines."  There would seem to be no other finding in the making of which the foregoing certified copies could have been used.  And yet all the facts there found were shown by parol evidence without objection and not disputed.  The position of the plaintiff being that, notwithstanding the mechanical principles going to make up the combination were common and well understood, the combination was new and consequently could constitute a secret device which equity would protect as a trade secret.  There is nothing in the findings to the contrary of this conclusion.  Nor do we make any holding of law in conflict therewith.  As before observed, the most important question in review is,

whether the alleged trade secret has been kept secret, and the result thereof reached controls in the disposition of the case.    With the case standing in this way, we assume, without deciding, that there was error in the rulings connected with the reception of the certified copies, and in permitting their meaning or purport to be shown by the testimony of witnesses, yet it is not believable that the rights of the parties were injuriously affected by such errors.

[23, 24]    (C5).    The two sons of the plaintiff testified that on a certain occasion in April, 1921, defendant told them he had always known that the reason the point machine had never been patented was that they (Hubbard and McClary) considered the secret worth more than the patent, as they never intended to put the machines on the market.    To meet this evidence (which plaintiff says shows that defendant had knowledge of the claim of a trade secret by Hubbard & McClary) defendant denied making the statement.    Being asked to tell what was said about a secret in connection with the Hubbard and McClary business, defendant said: ''I asked the McClary boys if they were aware there was a secret connected with this business, and they said they were not.    I then went on to explain that I had been informed by my father that at the time he invented his glazier's point and driver he gained his inspiration from what was known as the Sharps rifle, which as a boy he had known, during the 50's, in connection with some of his early work.''    Defendant was permitted to take a Sharps rifle (one being present) and explain just what he meant, and what, if anything, there is about the two machines that is similar.    The explanation given was lengthy, in the course of which defendant said his father ''was shown this device by Mr. Lawrence at Hartford, sometime in the late 50's.''    After the answer was concluded, and after another question was asked and answered, and still another question asked, the plaintiff moved to strike out the part of the long answer quoted above, as hearsay, and for an exception if allowed to remain.    The court answered, ''Yes, if you want it.''    Whether what the court said had reference to the motion to strike out, or to noting an exception, is not clear.    However, the plaintiff must have known that part of the answer to be hearsay as soon as given, and there was ample opportunity for him to move to strike it out at the end of the answer and before another

question was asked the witness. The motion not being then made, its refusal was not error. The evidence explaining the similarity in principle of the rifle was not erroneously received in connection with the testimony of the witness as to what he told the McClary boys. It tended to strengthen his testimony in that respect.

[25]    (C6).    In defendant's testifying to his price being $5,000, when attempting to negotiate with the plaintiff through his two sons, as stated above, he was asked whether in his judgment such sum was a fair consideration for that which he proposed to turn over. Objection was made as immaterial. It had some bearing on the question of his good faith, and was properly received.

On the record we therefore hold that the alleged trade secret was not kept secret, and that the plaintiff has no right of property therein which a court of equity will protect.

*Decree affirmed and cause remanded with directions that the injunction be dissolved; that the defendant on motion be granted leave to file a cross bill, and on its being filed, that the damages, if any, to the defendant by the injunction be ascertained and decreed, and upon such decree being passed, that the original bill be dismissed with costs of suit to the defendant..*